Mrs. June P. HIGGINBOTHAM, et al., Plaintiffs,

v.

U.S. INDUSTRIES, INC., d/b/a Con-Plex, Division of U.S. Industries, Inc., Defendant.

Mrs. Margaret H. DURHAM, et al., Plaintiffs,

v.

U.S. INDUSTRIES, INC., d/b/a Con-Plex, Division of U.S. Industries, Inc., Defendant.

Civ. A. Nos. J80–0177(N), J80–0178(N).

United States District Court, S.D. Mississippi, Jackson Division.

Aug. 11, 1982.

H.B. Mayes McGehee, Meadville, Miss., James P. Cothren, Jackson, Miss., for plaintiffs.

John L. Maxey, II, Jackson, Miss., Thomas W. Prewitt, Phil B. Abernethy, Jackson, Miss., for defendant.

## MEMORANDUM OPINION

WALTER L. NIXON, Jr., Chief Judge.

These consolidated wrongful death actions were filed by the lawful heirs of Billy Robert Higginbotham and Clement F. Durham against the defendant, U.S. Industries, Inc., d/b/a Con-Plex, Division of U.S. Industries, Inc. (Con-Plex), in the Circuit Court of Franklin County, Mississippi, and were removed to this Court by the defendant.

Each group of plaintiffs seek damages from the defendant for personal injuries

and death of their deceased husband and father who lost their lives on April 13, 1974, when they drowned in the Homochitto River as the result of the collapse of two bridge spans into the river on Mississippi State Highway 33, which had been constructed by the defendant for the Mississippi State Highway Department and accepted by the Department approximately two months prior to the collapse. The bodies of the two deceased were found many miles downstream several days after they were seen in the river following the collapse of the bridge during one of the almost annual floods of the Homochitto River which was traversed by the bridge in question, which connected Franklin and Wilkinson Counties as part of State Highway 33.

As a result of a previous flood of the Homochitto on December 6, 1971, major sloughing occurred on the north bank of the river, requiring closing of the bridge to traffic. The State Highway Department (the Department), which knew that the stream of the Homochitto was moving in a northerly direction and that the soil of the north embankment was easily erodible, undertook to have the three-addition span in question constructed from the north bank to connect to the existing span so that the bridge could be re-opened to traffic. The Department and the Federal Highway Administration, which was funding 100 percent of the project under its Emergency Relief Program, compromised on the design and budget for the addition to the bridge, which both agencies thought would overcome the then existing erosion problem.

The Bridge Division of the Department designed a three-span extension or addition to be added onto the north abutment of the present bridge, and these plans were circulated throughout the Department's Project Office, District Office, and Central Office in Jackson. The plans and specifications were examined and approved at each one of these levels and were also circulated through the Federal Highway Administration and examined and approved by the engineers of that agency. These plans were then sent out for competitive bids,

and the defendant, Con-Plex, together with other contractors, bid the project on the basis of the plans, as required, inasmuch as a bidding contractor was not permitted to make any reservations or exceptions for the Department's plans; otherwise, its bid would be rejected.

Con-Plex bid the job for a total price of $349,834.94, was awarded the contract, which it signed on March 1, 1973, agreeing to construct the three new 100-foot spans. The defendant was required to and did post a bond guaranteeing that it would complete the project in strict compliance with the plans and specifications furnished by the Department, and agreed to perform the construction under the direct supervision and to the full satisfaction of the Department's inspectors.

The three new 100-foot spans were to be added onto the north end of the existing bridge, with no part of these three spans to actually be over the river stream or bed, but rather entirely over the north embankment of the river. At the time of preparation of the plans, the pilings beneath the north end of the then existing "old bridge" were located on the edge of the embankment just north of the river bed and were designated Bent 5. The three new concrete spans were to be supported by three sets of new pilings, to be driven 100 feet apart and extending north from the north end of the old bridge over the north embankment of the river. The first set of new pilings to be driven north of the existing bridge was designated Bent 6, and the next two sets to the north thereof as Bents 7 and 8, respectively. The ground elevation extending north from Bent 5 of the existing bridge to Bent 8 was approximately 134 feet at the time of the bidding, and was generally level.

Inasmuch as the pilings beneath Bent 5 were almost in the river stream at the time of the bidding, the plans required the contractor to drive eight additional pilings beneath Bent 5, which already had eleven piles beneath it, and to reinforce all these nineteen pilings by encasement with a solid

concrete skirt. The plans further provided for driving eleven steel pilings into the solid embankment at Bents 6 and at 7, and fourteen pilings at the north end of the newly constructed addition at Bent 8, with approximately three feet of all these pilings to be exposed above ground level and all to be capped with ten feet of concrete. As originally designed, none of the pilings under Bents 6, 7 or 8 were to be exposed to the flow of the river or were to be reinforced by a solid concrete encasement or apron (as was Bent 5) or cross-bracing.

After being awarded the contract and before commencing work on the project, Con-Plex officials visited the site at least three times and found that conditions had greatly changed since their previous visits prior to bidding the project. As a result of these visits or inspections, and before commencing any work on the bridge project, Con-Plex wrote the Department Project Engineer on May 9, 1973 (Exhibit P–13), notifying him that "physical conditions at the site had changed greatly since the date of bidding; that is, that the designated area of the detour bridge, which was to be built in connection with this project, was completely washed away" and that "... physical conditions continue to change daily as more of the approach continues to slide into the river, which is cutting against the tow of the approach embankment." In this letter, Con-Plex further advised the Department that as of the date that it made its bid on April 24, 1973, the embankment was in place to the abutment of the existing bridge and that there were minor cracks within two to three feet of the abutment end; but that on May 1, upon viewing the bridge site, it was found that the area adjacent to the abutment had slid into the river for about fifteen feet beyond the abutment, and that beyond that area approximately another twenty-five feet of large cracks were beginning to appear in the embankment; that on May 4, the embankment had subsided for a distance of approximately forty feet behind the abutment, with cracks approximately twenty-five feet beyond that point; and on May 8, the embankment had subsided for approximately fifty feet behind the abutment, with cracks in the embankment sixty-five to one hundred fifteen feet behind the abutment. Con-Plex noted that the foregoing observations indicated "a progressive deterioration of the work area" and it made various observations and requests.

In its foregoing letter, the defendant stated that in order to perform the required work on the project, it would require a work bridge over the area and any subsequent areas where existing embankment had eroded and would continue to erode from conditions beyond its control; and that a seven-span work bridge would be required to perform the work on the existing abutment and to erect prestress beams, which would cost $5,943.00 per span, with the understanding that any further slides would require additional spans to be erected at the above cost. It was pointed out that flooding or other actions of the river may destroy all or part of the work bridge and require replacement of it at the above price per span. The defendant herein enclosed a design and cost breakdown of the requested work bridge.

Con-Plex further pointed out in its May 9 letter that because of the above changed conditions, the scope of construction methods had changed so as to require use of a larger crane than that originally planned in bidding the job, at additional cost to it. It cited the following factors in support of its contention that the Department had made the following provisions for this situation in Paragraph 5 of Section 104.2 of the 1967 Edition of the Mississippi Standard Specifications for Road and Bridge Construction: (1) physical deterioration since bidding the project; (2) apparent continuing deterioration (physical) of the work area; (3) the deteriorating condition was of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract, to the extent that such changes and conditions effect an inequity on the Contractor; (4) this required notification in writing of the conditions before further work was done affect-

ing sited (sic) conditions; and (5) requested engineering studies so that the director may provide for an adjustment in the Contract. In conclusion, the Contractor advised the Department that in view of the foregoing, an adjustment in contract time may be required and stated that it would be happy to meet with the Department's representatives to discuss the above conditions if so desired.

As a result of the above letter, as well as visits to the site by engineers from the District and Jackson Office of the Department following a pre-construction conference held on May 18, 1973, supplemental agreements were executed by the Department and Con-Plex, each of which referred to and reflected the Department's knowledge of the changed site conditions. Based upon the changed conditions, the Department, by the above supplemental agreements, made certain changes in the project, including elimination of a temporary detour bridge which had been provided for in the original contract, provided for the construction of a pedestrian bridge, a sheet pile retaining or protective wall out in the river to be back-filled with dirt from the adjacent embankment between Bents 6 and 8, and an earthen ramp upon which Con-Plex could operate its crane for access to Bent 5, at increased costs. Authorization was also given to construct a temporary pedestrian walkway traversing the river from the old section of the bridge to the north embankment, at an additional cost, in addition to extending the contract completion date to prevent Con-Plex's payment of liquidated damages which would have been payable for failure to complete construction within the original contract time. No other changes were ever made to the contract, and none of the above related in any way to modification or change in the structural design of the new spans.

Con-Plex completed the construction project under the daily supervision and inspection of the Department's inspector, and the Department by letter of November 20, 1973, gave Con-Plex a partial maintenance release and opened the bridge for traffic. On February 11, 1974, following final inspection by engineers of the Department, including those from the Bridge Division, and engineers from the Federal Highway Administration, the project was formally accepted as having been satisfactorily completed by Con-Plex in accordance with the plans and specifications. (Exhibit D–20)

On April 13, 1974, approximately two months after completion and acceptance of the project, the two southernmost of the three new additional spans constructed by the defendant collapsed and fell into the river when the Bent 6 pilings buckled during a rather severe flood resulting from heavy rains throughout the Homochitto River Basin. As a result of this flood, the north embankment of the river at Highway 33 immediately north of the river bed was washed out completely beyond the three-span addition which Con-Plex had constructed, including the area at Bents 7 and 8 (Exhibit D–26).

Shortly before the collapse of the two spans, the plaintiffs' two decedents had parked the two vehicles which they had been driving on Highway 33 north of the bridge, which had not been closed to vehicular traffic at that time, after observing a large number of people standing on or near the bridge, in order to observe the flooded river. The two spans in question suddenly and without warning collapsed into the river at a time when apparently only the two decedents were standing thereon, and their bodies were observed by other standersby as they were swept down the river by the rapidly flowing waters. One witness saw Mr. Higginbotham alive and treading water as he went downstream with the current. As previously stated, both Messrs. Durham and Higginbotham drowned, and their bodies were found several days later many miles downstream from the collapsed bridge spans.

In their Declarations filed in State Court and in the Pre-trial Order entered herein, the plaintiffs charged that the following acts and omissions of the defendant constituted gross negligence which proximately resulted in injuries to and the drowning

deaths of the decedents: (1) that the defendant knew or in the exercise of reasonable care should have known of the annually recurring floods of the Homochitto River and its easily erodible sand and silty clay soils, but nevertheless constructed the bridge in such a manner that the unbraced and unsupported pilings could not withstand the erosion occurring during the flood stages of the river; (2) failure of the defendant to perform a load test on the test piling driven beneath Bent 6, as required by the plans and specifications, and which would have revealed that they would not support the weight of the bridge in the event of erosion; (3) failure to join or tie the pilings with supporting braces in order to make them structurally sound; (4) failure to use reasonable care to prevent disturbance of the soil in the work area of Bent 6 by its equipment in construction operations, and in failing to compact the back-fill used in constructing the bridge approach embankments and abutments so as to prevent scouring or erosion; (5) failure to make necessary calculations through its own engineering personnel to determine the structural integrity of the bridge after substantial physical changes had occurred in the area; (6) failure to construct the bridge in a workmanlike manner, evidenced by driving unbraced pilings beneath Bent 6 into the highly erodible soil that had been pushed out into the river from the adjacent embankments within the flood plane of the river, rather than into a soil embankment, as required in the original plans and specifications, and its filling around the pilings beneath Bent 6 with loose and highly erodible soil, which resulted in expected erosion, exposing a sufficient length of the unbraced piling above ground level to the extent that it was no longer capable of supporting the bridge because its load-bearing capacity had been reduced to a level below that required by the plans and specifications; (7) the engineering personnel of the defendant, who had extensive experience in bridge construction, knew or should have known that the unbraced pilings beneath Bent 6 could not support the load required by the plans and specifications when the pilings became exposed to the expected natural erosion of the loose material fill pushed out around the pilings; (8) the failure of Con-Plex to require changes in the plans and specifications originally drafted by the Department, after becoming aware of the physical changes in the work site personally observed during the inspections made by the defendant's personnel prior to commencing work, and its failure to adequately advise the Department in writing of the dangers created by such physical changes before proceeding with construction; and (9) turning the completed project over to the Department in a condition so negligently defective as to be imminently dangerous to the safety of the traveling public.

The defendant counters with the following averments in defense of the foregoing charges of negligence: That it informed the Department in writing (Exhibit P–13) that site conditions had greatly changed since the contract had been awarded and prior to the initiation of construction, pointing out in detail all the various changes that it observed, and that a preconstruction conference was also held following the Department's receipt of that letter, after which representatives of the Department and the Federal Highway Administration observed the changed site conditions prior to commencement of construction; that despite the foregoing, the Department at no time revised or changed the plans and specifications for construction of the three additional bridge spans, except as set forth in the supplemental agreements, and that defendant did not have the power or authority to do so but was compelled and bonded to construct the additional spans in strict conformance with the plans and specifications which were prepared by the engineers from the Department, the largest designer of bridges in the State of Mississippi; the plans and specifications prepared by the Department were not so openly and obviously defective that a reasonable contractor would not have followed them; that it was justified in relying upon the expertise and skill of the expert bridge construction

engineers employed by the Department, and was not required to, and did not employ any structural or design engineers chargeable with structural design or integrity expertise; they constructed the bridge spans in strict compliance with the plans and specifications and under the constant supervision and inspection of the inspector of the Department who was on the project site at all times to ensure that the work was performed according to the plans and specifications prepared and furnished by the Department; the defendant utilized skilled employees and non-defective materials in the construction of the project; and it was not guilty of any of the foregoing negligent acts or omissions alleged by the plaintiff.

When pared to the bone, the plaintiffs' case against the defendant is bottomed on two general interrelated allegations of negligence: first, that the construction of the bridge by the defendant was not performed in compliance with the plans and specifications prepared and furnished by the Department, but even if so, it was not performed with that degree of skill and care which should have been exercised by a reasonably prudent contractor under the circumstances and thus constituted negligence; and, secondly, even assuming that proof of the foregoing is lacking, that the plans which were drawn by and furnished to the contractor by the Department, and upon which the defendant's bid was based, were at the time of commencement of and during construction, so obviously and patently defective or dangerous that no reasonable and prudent contractor, including the defendant, should have proceeded to construct the bridge addition in accordance therewith. Each of these alleged acts of negligence which the plaintiffs charge proximately caused or proximately contributed to cause the buckling of the pilings under Bent 6 resulting in the collapse of the two spans in question, consists of several facets or sub-charges, which will be discussed.

■ The controlling rule of law is that a contractor is liable for injuries to third persons injured as a result of his work if it is proved that he was guilty of negligence during performance or non-performance which was a proximate contributing cause of injuries, damages, or death of a third person. Stated differently, a building contractor is held to the general standard of reasonable care for the protection of anyone who may be foreseeably endangered by the negligence of the contractor, even after acceptance of the work by the owner. *Holmes v. T.M. Strider & Co.*, 186 Miss. 380, 189 So. 518 (1939).

■ However, a contractor is not liable to third persons in the absence of his negligence in the performance of the contract, if he has done so in accordance with the plans, specifications, and directions given to him by the owner or employer, since in that case the responsibility is assumed by the latter, except where the plans and specifications are so obviously dangerous and likely to cause injury to others that an ordinary and reasonable contractor of ordinary prudence in his field would or should not follow them. *Davis v. Henderlong Lumber Co.*, 221 F.Supp. 129 (Ind.1963); *Ryan v. Feeney and Sheehan Manufacturing Company*, 239 N.Y. 43, 145 N.E. 321 (1924).

The wellspring or basis for liability in a tort action against a building contractor, which is an exception to the "acceptance doctrine" in a contract action, is that actual or constructive knowledge of a danger or defect in plans and specifications gives rise to a duty to use due care to avoid foreseeable injury to others. It is a breach of this duty which imposes liability in a tort action.

It is our responsibility to now apply the foregoing principles of law to the facts of this case as we, the fact finder, find them to be from the evidence of record.

This Court will first address the plaintiffs' allegations that the defendant was negligent in the manner in which it constructed the three-span addition to the bridge pursuant to its contract with the Highway Department and in accordance with the plans and specifications developed and drawn by the Department, with its

bonded assurance that it would not deviate therefrom. Initially, plaintiffs apparently do not charge the defendant with using defective materials or incompetent or unskilled employees in constructing the three additional bridge spans. They do contend that the defendant failed to perform the project in strict compliance with the plans and specifications and was negligent in the manner of performing its work for the following reasons: (1) failing to recognize or pay heed to the loss of soil stability in the area where the pilings for Bent 6 were to be driven, which was apparent from the report reflecting the test pile driven by the defendant (Exhibit P–12), which revealed that the blows of the hammer required for each foot of penetration down to a depth of twelve feet met with almost no resistance, and thus was not consistent with the soil profile or soil boring detail sheet on the original plans, which any reasonable and prudent contractor should have recognized as a loss of soil stability; (2) failing to perform a load test on the test pile at Bent 6 for which the defendant had included a cost in its bid; (3) driving pilings at Bent 6 with over twenty-five feet of their unbraced lengths extending above ground elevation, which was beyond their load bearing capacity to support the dead weight load that they were designed to support according to the original plans and specifications, and despite the fact that the plans and specifications called for pilings at Bent 6 to be driven into solid embankment, one hundred feet north of Bent 5, with a maximum exposure thereof of two and one-half to three feet above ground elevation; and (4) pushing out and compacting dirt around the pilings at Bent 6 after they were driven, which added no structural stability to the pilings, which was not in accordance with the plans and created a false appearance that the pilings had been driven into solid embankment as shown on the plans, thereby causing a latent defect.

The contract between the Mississippi State Highway Department and the defendant called for the driving of one test pile in order to obtain data for piling lengths near Bent 6. The test was performed under the supervision of and in the presence of the Highway Department's inspector on the job, Mr. Charles Costley, an engineering aide or assistant, who recorded the results thereof and sent them to the Department's project engineer, Mr. H.G. Miller, who in turn forwarded them to the Bridge Division, which made its determination of the appropriate and suitable lengths of the final pilings which would be utilized for the project, after consultation with the Federal Highway Administration. The Bridge Division recommended that the pilings be one hundred feet and one hundred ten feet long, rather than the planned seventy-five feet. The contractor had no right to determine how long the final pilings would be, and did utilize pilings of the length prescribed and directed by the Department (Exhibit D–34, Miller Deposition, at pp. 101–103).

■ The plaintiffs' allegation of negligence concerning the piling tests are without merit, despite the testimony of one of plaintiffs' witnesses, Mr. R.R. Berry, that the results of the test should have put the contractor on notice of the instability of the soil beneath Bent 6. Regardless of what was indicated by the test, it was the duty and prerogative of the Department's engineers, with the concurrence of the Federal Highway Administration, to determine the necessary lengths of pilings to be driven to support the bridge spans, and this determination was made by these engineers after studying the results of the tests recorded by the Department's inspector and performed under his supervision. Con-Plex was bound to and did utilize the length of piling designated by the Department. Furthermore, the plaintiffs' expert witness, Dr. Dean C. McKee, testified that the length of the pilings under Bent 6 had nothing to do with the collapse of the two spans in question.

■ The plaintiffs next contend that the defendant failed to comply with the requirement that a load test be conducted on the test pile at Bent 6, for which Con-Plex had included cost in its bid. Mr. Berry, one

of plaintiffs' expert witnesses, testified that the failure to conduct the load test was extremely important, because it would have produced buckling which later occurred on April 13, 1974. This assertion, without more, is rejected by this Court as the trier of fact, inasmuch as it is contrary to the opinions of both of plaintiffs' experts that the sole cause of the buckling of the pilings under Bent 6 was their exposure of approximately twenty-five feet at the time of the collapse, which would not have been the case if the load test had been conducted on the test piling. Furthermore, it was not unusual to dispense with the load test in constructing highway bridges; rather, this was normally done unless there was a failure to obtain the required bearing under the hammer on the test piling. Here the Department was satisfied with the data received from the pile test, and exercising its prerogative to either dispense with the load test or to require one, did, in the pre-construction conference, through its Mr. Truitt, inform the defendant contractor that a load test would not be required when asked by the defendant's project superintendent, Herbert Lewis, Jr., whether it would be necessary if bearing was reached on the test pile. The evidence discloses that the Department did dispense with the load test, and thus this contention is without merit.

The third and principal charge of negligence, which is interrelated to that concerning the open and obvious defect and danger of the plans and specifications existing at the time the defendant began construction of this project, and which will be discussed in more detail, is based upon plaintiffs' contention that the manner in which the pilings under Bent 6 were driven and left unsupported overloaded their required dead load capacity, causing them to buckle. More specifically, it is contended that the plans and specifications prepared by the Department required the steel pilings under Bent 6 to be driven into solid ground, which did exist at the time the plans were prepared and at the time of bidding the job, with no more than three feet exposed above ground elevation; but

that at the time the defendant began work on the project, there had been extensive sloughing and erosion of the north embankment, which had subsided for approximately fifty feet north of the abutment of the existing bridge, with cracks in the embankment eighty-five to one hundred fifteen feet north of that abutment, resulting in the river stream being extremely close to the place where the eleven pilings were driven under Bent 6. There is no dispute that the above changes had taken place at that time, and that the original plans called for the pilings under Bent 5 to be driven into the ground a short distance north of the actual river bed, with those under Bent 6 to be driven one hundred feet to the north thereof into the solid embankment which existed at the time the plans and specifications were prepared and when the defendant bid the job on April 14, 1973.

The plaintiffs further allege that representatives of the defendant visited the site subsequent to the time of bidding and prior to the commencement of work on the project and found the above conditions to exist, but nevertheless failed to adequately notify the Department thereof, and of which it was ignorant; that the defendant drove the pilings under Bent 6 into the unstable erodible soil a short distance from the actual river stream, leaving between twenty and twenty-five feet of the pilings exposed above ground elevation, in direct contravention of the plans and specifications; and further, that it negligently failed to structurally shore the pilings, either by cross-bracing or enclosing them in solid concrete. In sum, plaintiffs argue that the cause of the collapse of the two spans was the twenty to twenty-five foot exposure of the Bent 6 pilings without reinforcement, which resulted in the inability of the unsupported length of pilings to carry the dead weight load, particularly in view of the texture and instability of the soil into which the pilings were driven.

As previously stated, in addition to the foregoing allegations of negligence, the plaintiffs further contend that the condition of the subsurface at the time that the de-

fendant commenced work on this project on May 16, 1973, differed greatly from that which existed at the time the plans and specifications were prepared and bid, thus making the plans openly and obviously defective or dangerous; that is, to proceed to build the structure in accordance with the plans of the Department would constitute an immediate danger to those utilizing the bridge in the future. Thus say the plaintiffs, the defendant owed the duty to adequately inform the Department of the above facts and to refuse to proceed to construct the bridge in accordance with the plans and specifications; and that their failure to discharge this duty constituted negligence which proximately caused the collapse of the two spans and the deaths of the decedents.

In their Response to the Defendant's Proposed Findings of Fact and Conclusions of Law filed with the Court, the plaintiffs concede that they have never contended and do not contend that the original plans prepared by the Highway Department were defective under the physical conditions existing at the time that they were drawn or on the date of the bidding or awarding of the contract to the defendant; and they further admit that neither the defendant nor any other contractor was under any duty to make a detailed engineering analysis of such plans at that time. What they do contend is that if, because of changes that did occur after the contract was awarded, from whatever source or cause, the defendant contractor knows or in the exercise of reasonable care should know that the structure to be built in accordance with the plans would be unsafe or dangerous to those expected to use it, it is the duty of the contractor, here the defendant, to call this to the attention of the owner and refuse to proceed with construction until the plans are modified in such a manner as to enable construction to proceed with safety to third persons who are to use the structure. They charge that Con-Plex failed to perform this duty and thus negligently and proximately caused the complained of injuries and deaths.

As previously noted, plaintiffs' negligence allegations which relate to the setting of pilings and soil conditions under Bent 6 are two faceted: (1) the plans and specifications were obviously defective and dangerous at the time of the commencement of the work, and (2) the negligent performance and non-performance of the defendant in driving the pilings under the then existing circumstances.

As stated, plaintiffs aver that the changed site conditions caused by the progressive erosion of the north embankment rendered the plans prepared by the Highway Department so obviously defective and dangerous that no reasonable contractor would or should have proceeded to perform in conformance therewith. It is undisputed that after bidding the job on April 14, 1973, representatives of the defendant visited the job site on May 1, 4, and 8, prior to beginning performance on May 16, 1973. As a result of those three visits or inspections, the defendant's vice president, James R. Crosby, on May 9, 1973, wrote to the Highway Department, attention H.G. Miller, the Department's project engineer, and copied the Department's chief engineer and construction engineer (Exhibit P–13). In this letter the defendant stated, among other things, that "... physical conditions have changed greatly since the day of bidding..." Con-Plex then pointed out specifically and exactly the changed site conditions which had occurred, stating, among other things, that the "physical conditions continue to change daily as more of the approach continues to slide into the river, which is cutting against the tow of the approach embankment." Mr. Crosby detailed in terms of feet how much of the area adjacent to the abutment of the existing bridge had progressively slid into the river on the three visits and the approximate distances from various points where cracks had appeared in the embankment, all of which he pointed out "indicates a progressive deterioration of the work area."

The plaintiffs contend that this detailed letter was inadequate, under the cir-

cumstances, to notify and warn the Highway Department of the existing danger of proceeding to construct in accordance with its plans, particularly in view of the fact that Con-Plex did not specifically request an engineering study, re-evaluation, or modification of the plans, but merely wrote for the purpose of requesting approval of necessary revised or changed construction methods and additional costs which it anticipated incurring because of the changed conditions. This Court disagrees with the plaintiffs. Regardless of the purposes or motive for writing the letter, it constituted detailed, adequate and sufficient notice to the owner (State Highway Department) of the great, rapid, and progressive changes that were occurring at the job site and pointed out that the "deteriorating condition (was) of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract, to the extent that such changes or conditions effect an inequity on the contractor." Defendant then "requested an engineering study so that the director may provide for an adjustment in the contract."

Both of the engineering experts who were called as witnesses by the plaintiffs unequivocally testified that had they been employed by the Highway Department at the time, the above letter would have constituted adequate notice of the changed conditions, and that they would have visited the site and made a determination whether design changes in the bridge were necessitated.

▮ Plaintiffs contend that this notice was never sent to the Bridge Engineering Division of the Highway Department, which should have been done. The uncontradicted testimony was that it was not customary or usual for bridge contractors in Mississippi to directly correspond with or notify the Bridge Engineering Division of the Highway Department of change conditions, but that it was customary, acceptable and adequate to write to the project engineer, which was done here. Furthermore, copies of the letter were sent to the chief engineer of the Highway Department as well as to the construction engineer. Of course, the Construction Division is the division with which the plaintiff dealt in bidding the job and with which it had to deal in connection with any changed construction methods and requests concerning additional costs. The chief engineer of the Department is the supervisor of all engineers in all divisions of the Highway Department, and therefore, notice to him constituted adequate notice to all divisions of the Department, including the Bridge Division. Mr. Julian R. Barksdale, Assistant Bridge Engineer in the Bridge Division, testified that he did not visit the site in question during construction or participate in the final inspection and does not recall changed site conditions being called to the attention of his division, but that if it had been, and the change had been great enough, he would have considered redesigning the structure. He further opined that the plans and specifications were not defective, that the Federal Highway Administration necessarily had to approve the plans before they were acceptable because it was a federally funded project, and that contractors had no duty to study or make an engineering analysis of plans and specifications for the building of bridge structures to determine their adequacy.

▮ The plaintiffs argue that this defendant admittedly was the largest bridge building contractor in the State of Mississippi as of 1973, having built hundreds of bridges, and had its own engineering department, and thus was charged with knowledge that the plans and specifications were defective and dangerous under the conditions that existed at the time that it commenced and continued to perform work on the project. This Court disagrees, inasmuch as it agrees with the testimony of the defendant's witnesses that neither custom nor legal duty required a bridge contractor to examine plans prepared by the Highway Department to determine the adequacy or safety thereof. On the contrary, contractors were required to bid jobs in strict accordance therewith under penalty of

bond forfeiture and cancellation of the contract. They are not legally liable to third parties for such performance, provided the plans and specifications are not openly and obviously defective and dangerous to the extent that they should constitute notice to any ordinary and reasonable contractor under the circumstances, which the Court finds was not proved by a preponderance of the evidence. The engineers, including Mr. Robert Bickerstaff, who was the defendant's chief engineer at all relevant times, but who is no longer employed by it, were construction engineers and not design engineers. Their expertise was in methodology and cost pricing of jobs and not in drawing or designing structures or determining the adequacy thereof, which was the prerogative and responsibility of the Highway Department's structural or design engineers. Thus, the defendant was not charged with knowledge of the latter through its construction engineers, including Mr. Bickerstaff, who comprised its engineering department. The defendant was justified in relying on the expertise and advice of the Department's design or structural engineers unless the plans were so obviously defective or dangerous to the ordinary reasonable bridge contractor, which the Court finds has not been proven by the plaintiffs by a preponderance of the evidence.

In any event, it was the responsibility of the Construction Division of the Highway Department to relay information concerning the changed site conditions to the Bridge Division if the Construction Division felt that additional design studies were needed. Actually, after the letter notice was received by the Highway Department, there was a pre-construction conference, at which members of the Federal Highway Administration, State Highway Department, and the contractor discussed the changed conditions. Thereafter, representatives of the Highway Department visited the construction site and assigned an inspector, Charles Costley, an engineering aide, to the job, with the responsibility of inspecting the work being performed.

As previously stated, the plaintiffs concede that the plans and specifications drafted and furnished to Con-Plex by the Department's engineers were not defective and dangerous at the time that they were prepared or at the time that the defendant bid the job. They charge, however, that these plans and specifications had become defective between the time of the bidding and the time that the defendant began construction by virtue of the greatly changed topographical conditions that existed at the site through erosion and sloughing of the north embankment. Although this Court, as the trier of fact, has found that the plans and specifications at the times in question were not so openly and obviously defective that a reasonable contractor, including the defendant, should not have built in accordance therewith, we feel that for the sake of completeness, we should resolve the conflicting testimony of the experts called by the plaintiffs and the defendant of whether the plans and specifications were, at the time of performance, defective and dangerous to third persons utilizing the bridge. After considering and weighing all the evidence, this Court finds that they were not.

The plaintiffs contend that during construction the north embankment either eroded or was excavated to such a level that excessive exposed and unsupported piling length existed above ground level under Bent 6. Their experts were of the opinion that an unsupported piling length of approximately twenty-five feet, which constituted approximately two and one-half times the length of the ten-foot concrete encasement on the top of each piling, would be structurally unsafe, and offered evidence of lay witnesses that twenty to twenty-five feet of the pilings were exposed above ground at the time they were driven and thereafter. They further argue that even if dirt was pushed around them and compacted subsequent to their being driven, and prior to the flood in question, this was insufficient to constitute adequate support thereof and thus created a dangerous condition. They further argue that these pilings should have been cross-braced or

encased in a solid concrete apron, as were the pilings under Bent 5, which were anticipated to be in the river bed at the time the plans were drawn; that it should have been further anticipated at the time that construction began that the pilings under Bent 6 would also be in the river bed in view of the fact that great topographical changes had occurred, as evidenced in Exhibit P–13. Thus plaintiffs argue that this condition constituted a dangerous condition inasmuch as the pilings were not driven into solid embankment and set in accordance with the plans and specifications which provided that no more than three feet thereof would be exposed above ground, even if the soil were pushed up and compacted around them.

There is no question but that the conditions in the area of Bent 6 had greatly changed between the time of bidding and the time construction began and that the deteriorating condition was of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract, all of which were specifically and clearly pointed out to the engineers of the Highway Department by the defendant in its May 9, 1973, letter (Exhibit P–13). Therefore, it became impossible for the contractor to drive pilings at Bent 6 so that only three feet thereof would remain exposed above ground, and this condition was certainly known by the chief engineer, construction engineer, and project engineer of the State Highway Department, as well as its inspector on the job. None of these employees of the Department apparently considered the situation to be dangerous inasmuch as they took no corrective action such as re-drawing the plans or changing the specifications or stopping work on the project, which they had the authority to do. Actually, the engineers of the Department who testified in this trial were of the opinion that the plans and specifications were not defective and did not constitute a danger to those who would utilize the bridge.

The driven pilings under Bent 6 were exposed some twenty or twenty-five feet above ground because of the greatly changed conditions. This was done with at least the tacit consent of the Highway Department. The original plans were modified so as to specifically allow Con-Plex to excavate the north embankment below the elevation shown on the original plans. The supplemental agreement which permitted this stated, in part:

> With the approval of the Engineer, this material (dirt to be installed behind the protective sheet pile retaining wall) will be obtained from below the finish elevation shown on the plans at no cost to the State. (Exhibit D–3)

Moreover, the State Highway Department and the Federal Highway Administration confirmed upon final inspection that Con-Plex constructed the project, including final ground elevations, in compliance with the plans and specifications, as amended.

A photograph in evidence made by the U.S. Geological Survey on November 30, 1973, subsequent to the Highway Department's initial acceptance of the project and the opening of the bridge to traffic (Exhibit P–53), graphically portrays that none of the pilings in Bent 6 were exposed above ground level below the ten-foot concrete encasement on top of each piling, and thus, at the time the bridge was opened for traffic, all of the pilings in Bent 6 had an unsupported length above ground level of less than ten feet, which was much less than the twenty-five feet of unsupported length which plaintiffs' experts testified would be unstable and dangerous. This was accomplished by the excavation during construction of the embankment at Bent 6 and the replacement of the material which was compacted prior to completion of the project. This Court finds, in accordance with the testimony of Mr. Barksdale, the Department's bridge engineer, that an over-excavation, if followed by refill and compaction, would have no effect on the structural adequacy of the bridge. Furthermore, the Highway Department's laboratory inspectors, after final inspection of the project, certified that all fill and com-

paction of the project was performed in compliance with State Highway Department specifications, stating:

> The results of the tests on record samples indicate ... (the) degree of compaction in embankment material ... (was) in reasonably close conformance with the approved plans and specifications. (Exhibit D–14)

Another photograph in evidence (Exhibit D–26) lends support to the defendant's argument and further convinces the Court that the refill and compaction of dirt around Bent 6 was not a proximate contributing cause of the foundation in that area being washed away, resulting in the exposure and buckling of the pilings and collapse of the bridge. This photograph, which was taken only a few days following the collapse, clearly shows that the embankment under Bents 7 and 8 had also been completely washed away by the flood, leaving them exposed much in excess of twenty-five feet. There is no evidence whatsoever to indicate that there was any excavation or refill during construction in the areas of either one of these bents, but the uncontradicted evidence is that the pilings thereunder were driven into natural ground in place, and that the pilings thereunder had no excessive exposure during or after construction or deviated from that shown in the plans and specifications prior to the flood in question.

This flood, which was considered a major or "thirty-five year" flood, was of sufficient severity or magnitude to completely wash out the embankment at Bent 6, regardless of what Con-Plex may or may not have done at that location during construction.

Of course, the plans and specifications did not provide for any cross-bracing or solid concrete skirt around the pilings of Bent 6. Even if a concrete apron or skirt had been placed around these pilings, more than twenty-five feet thereof would have been exposed below that skirt by virtue of the flood, as is evidenced by the above photograph. Also, the same number and type of steel pilings were driven under Bent 7 as were driven under Bent 6, and they were not cross-braced or encased in concrete, yet they did not collapse as a result of the flood, even though exposed as shown above.

In sum, this Court finds that the plaintiffs have failed to prove by a preponderance of the evidence that the defendant was guilty of any negligence which proximately caused or contributed to cause the collapse of the two bridge spans. On the contrary, we find that (1) the defendant provided no faulty workmanship or used any defective materials in the construction of this bridge project; (2) the plans and specifications prepared by the State Highway Department were not defective but if they were, that they were not so obviously or patently defective that no reasonably prudent contractor, including the defendant, would or should have proceeded with the construction of the bridge project unless and until such plans were modified to eliminate any structural defects then existing; on the contrary, Con-Plex did discharge its duty to adequately notify the State Highway Department and the Federal Highway Administration of the greatly changed conditions which had occurred between the time of bidding and the beginning of construction, and these two agencies were fully aware of those changes based on their own independent investigations; (3) the defendant did not fail to construct the bridge project in strict compliance with the original plans and specifications, as amended; and (4) the bridge project was not turned over to the State Highway Department in a negligently defective condition that made it imminently dangerous to the safety of the general public, for whose use and benefit it had been constructed.

Therefore, the defendant is entitled to a judgment dismissing this cause at the cost of the plaintiffs. Counsel for the defendant shall prepare a Judgment, approved as to form by plaintiffs' counsel, to be presented to this Court within the time prescribed by the local rules.